Electronically FILED by Superior Court of California, County of Los Angeles on 04/23/2021 07:53 AM Sherri R. Carter, Executive Officer/Clerk of Court, by AU Hung,Deputy Clerk

1  FRED D. HEATHER – State Bar No. 110650
   fheather@glaserweil.com
2  ELIAS DABAIE – State Bar No. 288010
   edabaie@glaserweil.com
3  GLASER WEIL FINK HOWARD
     AVCHEN & SHAPIRO LLP
4  10250 Constellation Boulevard, 19th Floor
   Los Angeles, California 90067
5  Telephone:  (310) 553-3000
   Facsimile:   (310) 556-2920
6
7  *Attorneys for Defendants*
   *Alkiviades David and Hologram USA Inc.*
8
9            SUPERIOR COURT OF THE STATE OF CALIFORNIA
10               FOR THE COUNTY OF LOS ANGELES
11
12 ELIZABETH TAYLOR, an individual,        Case No. BC649025
   CHASITY JONES, an individual,           *Unlimited Jurisdiction*
13
                          Plaintiffs,       Assigned to the Honorable Yolanda Orozco
14                                          Department: 31
   v.
15                                          **DEFENDANT ALKIVIADES DAVID'S**
   ALKIVIADES DAVID, an individual,         **NOTICE OF MOTION AND MOTION**
16 HOLOGRAM USA, INC., a Delaware corp.,    **FOR SANCTIONS AGAINST PLAINTIFF**
   HOLOGRAM USA ENTERTAINMENT,             **CHASITY JONES AND HER**
17 INC., a Delaware corp., FILMON MEDIA     **ATTORNEYS; REQUEST FOR**
   HOLDINGS, INS., a Delaware corp.,        **EVIDENTIARY HEARING**
18 FILMON.TV, INC., a Delaware corp.,
   FILMON.TV NETWORKS, INC., a Delaware     *[Declaration of Fred D. Heather and Request*
19 corp., ALKI DAVID PRODUCTIONS, INC.,     *for Judicial Notice filed concurrently herewith]*
   a Delaware corp., ANAKANDO MEDIA
20 GROUP USA, an unknown_ business entity,  Date:   August 18, 2021
   FILMON.TV UK LIMITED, a foreign          Time:   8:30 a.m.
21 corporation; and DOES 1 through 25,      Dept:   31
   inclusive
22                         Defendants.       Reservation ID: 100082895195
23
24
25
26
27
28

**DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY
JONES AND HER ATTORNEYS; REQUEST FOR EVIDENTIARY HEARING**

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 18, 2021 at 8:30 a.m., or as soon thereafter as the matter may be heard in Department 31 of the above-captioned court, located at 111 North Hill Street, Los Angeles, California 90012, defendant Alkiviades David ("Mr. David") will and hereby does move for an order awarding sanctions against plaintiff Chasity Jones ("Ms. Jones") and her counsel of record, in favor of Mr. David, for Ms. Jones and her attorneys' conduct in the trial of this matter.  Mr. David seeks (1) monetary sanction against Ms. Jones and her attorneys in an amount representing Mr. David's attorney's fees and other costs incurred in connection with this motion and the trial of this matter as well as such additional amounts necessary to penalize and deter the misconduct which is the subject of this motion; (2) referral of Ms. Jones' attorneys to the California State Bar for review for possible disciplinary action; and (3) an evidentiary hearing where Ms. Jones and her counsel will testify under oath and subject to cross examination, or in the alternative, an order for Ms. Jones and her counsel to be deposed under oath prior to the Court's decision on the merits of the instant motion, and such further relief as the Court deems just and proper.

This motion is based on this notice, the attached memorandum of points and authorities, the declaration of Fred D. Heather and all exhibits thereto, the Request for Judicial Notice, and upon such other matters, whether written or oral, as may be presented to the Court in reply to this motion or in connection with any hearing on this motion.

DATED:  April 28, 2021

GLASER WEIL FINK HOWARD
AVCHEN & SHAPIRO LLP

/s/Fred Heather

By: _____
Fred D. Heather
Elias Dabaie
*Attorneys for Defendant Alkiviades David,*
*Hologram USA Inc., and FilmOn.TV, Inc.*

**DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY JONES AND HER ATTORNEYS; REQUEST FOR JUDICIAL NOTICE**

1986265

# TABLE OF CONTENTS

Page

I.   INTRODUCTION.................................................................................................. 1

II.  ARGUMENT ........................................................................................................ 4

     A.   Courts Have the Authority to Award Sanctions for Litigants' Abuse of the
          Litigation Process .................................................................................... 4

          1.   The Trial Court Has The Inherent Power to Sanction Ms. Jones and
               Her Attorneys ................................................................................. 4

          2.   A Motion for Sanctions is Proper................................................... 5

          3.   Ms. Jones' Attorneys Misled the Court with Respect to the Operative
               Complaint ........................................................................................ 7

          4.   Ms. Jones Submitted an Untruthful Sworn Declaration to the Court........ 10

          5.   Ms. Jones Was Untruthful and Dishonest in Her Trial Testimony .......... 12

          6.   Ms. Jones' Attorneys "Bullied" At Least One Potential Witness to
               Testify on Ms. Jones' Behalf.......................................................... 13

III. EVIDENTIARY HEARING.............................................................................. 15

IV.  REQUEST FOR RELIEF.................................................................................... 15

**DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY JONES AND HER ATTORNEYS; REQUEST FOR JUDICIAL NOTICE**

1986265

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

Aoude v. Mobil Oil Corp.,
    892 F.2d 1115 (1st Cir. 1989) ............................................................. 4

United States v. Nixon,
    418 U.S. 683 (1974) ............................................................................ 1

## STATE CASES

Arc Inv. Co. v. Tiffith,
    164 Cal. App. 2d Supp. 853 (1958) .................................................... 4

Brydonjack v. State Bar of Calif.,
    208 Cal. 439 (1929) ........................................................................... 4

Conn v. Superior Court,
    196 Cal. App. 3d 774 (1987) ............................................................. 4

Day v. Collingwood,
    144 Cal. App. 4th 1116 (2006) ...................................................... 6, 7

Dep't of Forestry & Fire Prot. v. Howell,
    18 Cal. App. 5th 154 (2017) .............................................................. 6

In re Vargas,
    83 Cal. App. 4th 1125 (2000) .......................................................... 12

Milholen v. Riley,
    211 Cal. 29 (1930) ............................................................................. 4

Peat, Marwick, Mitchell & Co. v. Superior Court,
    200 Cal. App. 3d 272 (1988) ............................................................. 4

Plascencia v. Deese,
    59 Cal. App. 5th 1148 (2021) ............................................................ 3

Poor v. W.P. Fuller & Co.,
    30 Cal. App. 650 (1916) .................................................................. 12

Russell v. Dopp,
    36 Cal. App. 4th 765 (1995) .......................................................... 4, 5

Rutherford v. Owens-Illinois, Inc.,
    16 Cal. 4th 953 (1997) ...................................................................... 4

Simmons v. Southern Pac. Trans. Co.,
    62 Cal. App. 3d 341 (1976) ............................................................... 3

Glaser Weil

iv

**DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY JONES AND HER ATTORNEYS; REQUEST FOR JUDICIAL NOTICE**

1986265

*Varian Med. Sys., Inc. v. Delfino*,
    35 Cal. 4th 180 (2005)................................................................................. 6

## **STATE STATUTES**

Cal. Civ. Code § 52.4 .................................................................................. 7

Cal. Code Civ. Pro. § 916 ........................................................................... 5

Cal. Const., art. VI, § 13 ............................................................................. 3

Cal. Gov. Code § 12653 .............................................................................. 7

Cal. Pen. Code § 118 ................................................................................... 1

Cal. Pen. Code § 127 ............................................................................ 1, 15

Cal. Pen. Code § 132 ................................................................................... 1

Cal. Pen. Code § 134 ................................................................................... 1

## **STATE RULES**

Ca. Prof. Conduct, Rule 3.3(a)(1) .............................................................. 9

## **OTHER AUTHORITIES**

Daniel J. Meador, Inherent Judicial Authority in The Conduct of Civil Litigation (1995) 73
    Tex. L. Rev. 1805........................................................................................ 5

Glaser Weil

**DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY
JONES AND HER ATTORNEYS; REQUEST FOR JUDICIAL NOTICE**

1986265

**I.      <u>INTRODUCTION</u>**

The very cornerstone of our common law system is the search for truth through trials.  This fundamental understanding lies at the heart of courts' reluctance to embrace limitations on the introduction of relevant evidence, *see, e.g., United States v. Nixon,* 418 U.S. 683, 710 (1974), to the oaths that jurors take to find a "true verdict," and, most importantly, to the attorneys who are charged, as officers of the court, to serve as advocates in service of the truth.  Harsh penalties rightly apply to those who would undermine this effort: perjury and suborning perjury are felonies (Cal. Pen. Code §§ 118 & 127), as is presenting false evidence at a trial (Cal. Pen. Code § 132) and falsifying evidence.  Cal. Pen. Code § 134.

The penalties are harsh because the crimes are harsh, and strike at the very foundation of the justice system, whether criminal justice or civil justice—and that is exactly what transpired here.  The plaintiff, Chastity Jones, perjured herself with an indisputably false declaration about her criminal history.  Regardless of whether this perjury resulted from the inexcusable negligence—or worse from intentional conduct—by Ms. Jones' attorneys, including both Lisa Bloom and Alan Goldstein at The Bloom Firm, both of those officers of the court chose to further pervert the administration of justice by misrepresenting key facts to the Court and ***then failing to correct those facts even as they tried to verdict*** a cause of action against Mr. David that was not a pending claim.

These are grave misdeeds, and they are made even more grave due to the demonstrable material harm that they caused to the administration of justice in this case.  One of the claims on which Mr. David was found liable was a claim that did not even exist in the operative pleadings, and was ***only*** tried due to misrepresentations by Ms. Jones' attorneys that they left uncorrected.  Nor was this a relatively benign finding of liability, such as for a breach of contract; it was for gender violence, a rightly reviled form of behavior whose stain cannot simply be expunged by vacating an improper verdict.

Even setting aside the misconduct that ever allowed that claim to be tried, the perjured testimony by Ms. Jones avoided a full and fair presentation of relevant, admissible evidence of Ms. Jones' criminal past and propensity for falsehoods, which deprived the Court of making a fully-

**DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY JONES AND HER ATTORNEYS; REQUEST FOR EVIDENTIARY HEARING**

1 informed decision regarding whether Ms. Jones' criminal history and then-current perjury about that

2 criminal history should be heard by the jury.

3    There must be consequences for Ms. Jones and her counsel's assault on the bedrock of the

4 American justice system.  Fortunately, there are: established precedent entitles Mr. David to

5 sanctions and other equitable relief from Ms. Jones and her attorneys' misconduct. [1]  Remedying

6 this misconduct remains within this Court's jurisdiction, and its power to take action has not been

7 deprived by the pending appeal.  The Court should do so, swiftly and forcefully, in order to right the

8 miscarriage of justice that has been perpetrated by Ms. Jones and her counsel, including not only

9 The Bloom Firm as an entity, but also Ms. Bloom and Mr. Goldstein as individuals.

10    The misrepresentations and perjury which permeated the Chasity Jones trial included, but

11 were not limited to, the following:

12 • Ms. Jones' attorneys misled the Court into believing that the operative complaint was a First

13    Amended Complaint ("FAC"), which contained a cause of action for gender violence that

14    was not in the original complaint.  In fact, the FAC containing the gender violence claim had

15    been stricken by the Court.  When given the opportunity to correct the record, Ms. Jones'

16    attorneys failed to do so.  As a result, Mr. David unfairly was found liable on a claim that

17    should not have been tried.

18 • Ms. Jones perjured herself when she submitted a sworn declaration to the Court concerning

19    material facts regarding her federal bank fraud conviction.  Lying about the amount of

20    restitution ordered, Ms. Jones misrepresented her compliance with the conditions of her

21    probation and omitted the fact that she had been ordered to serve a period of time in custody.

22    At a probation violation proceeding, Ms. Jones had admitted her non-compliance, which

23    resulted in the extension of her probation.  Because of her perjury, Ms. Jones' motion *in*

24    *limine* to exclude evidence of that conviction was granted, prohibiting the introduction of

---

[1] When Mr. David's counsel bought some of these issues to this Court's attention in a hearing for an assignment order, a charging order, and appointment of a receiver brought by Ms. Jones (as a judgment creditor), the Court stated, in part, "I'm happy to see whatever it is you would like to file and see where we go there.  It's kind of an interesting attempt.  I don't know if it will be futile or fruitful, we shall see." Declaration of Fred Heather, Exhibit I (12:7-13:18.)

2

DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY
JONES AND HER ATTORNEYS; REQUEST FOR JUDICIAL NOTICE

1986265

1   evidence not only about this recent lie, but also about any aspect of Ms. Jones' criminal

2   conviction.

3       While the foregoing misconduct by Ms. Jones and her attorneys is sufficient to warrant

4   severe sanctions against them, the Court should also be aware of other facts that bring to light the

5   full extent of the miscarriage of justice that has occurred in this case.  For example,

6   •   Information recently obtained from witnesses with percipient knowledge of relevant facts,

7       who did not testify at the Jones trial, demonstrate that Ms. Jones' trial testimony concerning

8       Mr. David and her own conduct in the workplace was false.

9   •   A percipient witness, who did not testify at trial, stated that she believed Ms. Jones' lawyers

10      had tried to bully her into testifying at trial on behalf of Ms. Jones, urging the witness to

11      provide testimony the witness said would be false.

12      Taken together, the evidence is sufficient to show that the misconduct of Ms. Jones'

13  attorneys and Ms. Jones led to an undeniable "miscarriage of justice" about which the California

14  Court of Appeals has observed, "[o]ne of the institutional functions of the California Court of

15  Appeal is to opine on whether or not an error at trial has resulted in a miscarriage of justice.  (Cal.

16  Const., art. VI, § 13.)"  *Plascencia v. Deese*, 59 Cal. App. 5th 1148 (2021).  Here, Mr. David is not

17  asking the Court to take action with respect to the judgment that is on appeal.  Instead, Mr. David is

18  seeking some fair and equitable measure of redress for the severe prejudice he suffered as a result of

19  the egregious misconduct by Ms. Jones and her counsel.  The Courts are well-armed to grant such

20  relief in the face of misconduct of the scope, scale, and severity exhibited here by Ms. Jones and her

21  attorneys.  As in every other state, our courts have the inherent power to protect the judicial process

22  from litigants who tamper with the administration of justice and threaten the integrity of the process.

23      This motion is not about defense counsel's conduct during the trial; i.e., whether counsel

24  waived any arguments or failed to introduce evidence, nor is it about whether the outcome of the

25  case would have been different.[2]  This motion is solely about Ms. Jones' perjury and the egregious

26  _____

27  [2] "[E]ven in the absence of an objection and request for admonition, where there are flagrant and repeated
    instances of misconduct, an appellate court cannot refuse to recognize the misconduct."  *Simmons v. Southern
    Pac. Trans. Co.*, 62 Cal. App. 3d 341, 355 (1976).  A trial court should give no lesser attention to egregious

28  misconduct.

3

**DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY
JONES AND HER ATTORNEYS; REQUEST FOR JUDICIAL NOTICE**

1986265

1  misconduct of her counsel, which combined, invaded the sanctity of the judicial process and the trial

2  and led to a miscarriage of justice.  In these circumstances, and based on the authority discussed

3  below, this Court is obligated to impose sanctions sufficient to deter such misconduct in the future

4  and to give some measure of redress to the victim—in this case, Mr. David.

5  **II.**     **ARGUMENT**

6        **A.**     **Courts Have the Authority to Award Sanctions for Litigants' Abuse of the**

7                **Litigation Process**

8        There is "no intrinsic limitation" on California trial courts' inherent power to remedy all

9  "forms of litigation abuse," or "to prevent the taking of an unfair advantage," or "to preserve the

10  integrity of the judicial system," or "to sanction misbehavior*." Peat, Marwick, Mitchell & Co. v.*

11  *Superior Court*, 200 Cal. App. 3d 272, 285-289 (1988).  Nor could there be.  Courts "cannot lack

12  the power to defend their integrity against unscrupulous marauders; if that were so, it would place at

13  risk the very fundament of the judicial system."  *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119

14  (1st Cir. 1989); *see also Arc Inv. Co. v. Tiffith*, 164 Cal. App. 2d Supp. 853, 856 (1958) (litigation

15  fraud); *Russell v. Dopp*, 36 Cal. App. 4th 765, 774-75 (1995) (fraud on the court).

16            **1.**     **The Trial Court Has The Inherent Power to Sanction Ms. Jones and Her**

17                    **Attorneys**

18        California courts "are set up by the Constitution without any special limitations; hence, the

19  courts have and should maintain vigorously all the inherent and implied powers necessary to

20  properly and effectively function as a separate department in the scheme of our state government."

21  *Brydonjack v. State Bar of Calif.*, 208 Cal. 439, 442 (1929).  Because courts are "part of and

22  belong[] to one of the three independent departments set up by the Constitution," they must have

23  "the power of self-preservation, indeed, the power to remove all obstructions to [their] successful

24  and convenient operation."  *Milholen v. Riley*, 211 Cal. 29, 33 (1930); *see also Rutherford v.*

25  *Owens-Illinois, Inc.*, 16 Cal. 4th 953, 967 (1997) ("inherent power to control litigation before

26  them"); *Peat Marwick, supra*, 200 Cal. App. 3d at 287 ("inherent power of the courts to control and

27  prevent abuses"); *Conn v. Superior Court*, 196 Cal. App. 3d 774, 785 (1987) (inherent power "to

28

4

1986265

1   make orders which prevent the frustration, abuse, or disregard of the court's processes"); *Russell,*

2   *supra,* 36 Cal. App. 4th at 775 (the court has the inherent power to protect itself from fraud).[3]

3      This inherent power of self-protection necessarily includes the ability—in appropriate

4   circumstances—to issue sanctions against litigants and their attorneys.

5                    **2.     A Motion for Sanctions is Proper**

6      The general rule is that an appeal stays proceedings in the trial court with respect to the

7   judgment appealed from and the matters embraced therein or affected thereby.  Cal. Code Civ. Pro.

8   § 916 provides:

9         (a) Except as provided in Sections 917.1 to 917.9, inclusive, and in Section
          116.810, the perfecting of an appeal stays proceedings in the trial court upon
10        the judgment or order appealed from or upon the matters embraced therein or
          affected thereby, including enforcement of the judgment or order, ***but the trial***
11        ***court may proceed upon any other matter embraced in the action and not***
          ***affected by the judgment or order.***
12
13        (b) When there is a stay of proceedings other than the enforcement of the
          judgment, the trial court shall have jurisdiction of proceedings related to the
          enforcement of the judgment as well as any other matter embraced in the action
14        and not affected by the judgment or order appealed from.

15  (Emphasis added.)

16      While it is true that a there is a stay in this action due to the pending appeal, the stay does not

17  apply to the instant motion for sanctions because the issue before the Court is a "collateral matter"

18  to the appeal.  The California Supreme Court has opined:

19        In determining whether a proceeding is embraced in or affected by the appeal,
          we must consider the appeal and its possible outcomes in relation to the
20        proceeding and its possible results.  "[W]hether a matter is 'embraced' in or
          'affected' by a judgment [or order] within the meaning of [section 916]
21        depends on whether postjudgment [or postorder] proceedings on the matter
          would have any effect on the 'effectiveness' of the appeal." [Citation.]  "If so,
22        the proceedings are stayed; if not, the proceedings are permitted." [Citation.]

23        The fact that the postjudgment or postorder proceeding may render the appeal
          moot is not, by itself, enough to establish that the proceeding affects the
24        effectiveness of the appeal and should be stayed under section 916.  Rather,
          something more is needed.  For example, the trial court proceeding must
25

26  ――――――――――――――――
    [3] *See generally* Daniel J. Meador, Inherent Judicial Authority in The Conduct of Civil Litigation (1995) 73
27  Tex. L. Rev. 1805, 1811 ("Inherent powers consist of all powers reasonably required to enable a court to
    perform efficiently its judicial functions, to protect its dignity, independence and integrity, and to make its
28  lawful actions effective.  These powers are inherent in the sense that they exist because the court exists; the
    court is, therefore it has the powers reasonably required to act as an efficient court.").

**DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY
JONES AND HER ATTORNEYS; REQUEST FOR JUDICIAL NOTICE**

1   directly or indirectly seek to "enforce, vacate or modify [the] appealed
    judgment or order." [Citation.]  Or the proceeding must substantially interfere
2   with the appellate court's ability to conduct the appeal.  (See, e.g., Hollaway v.
    Scripps Memorial Hosp. (1980) 111 Cal.App.3d 719, 723–724, 168 Cal.Rptr.
3   782 [holding that a pending appeal precludes the trial court from issuing an
    order relieving the parents as plaintiff's guardians and appointing new counsel
4   for plaintiff because the order interferes with the conduct of the appeal].)

5   *Varian Med. Sys., Inc. v. Delfino*, 35 Cal. 4th 180, 189-90 (2005).

6         Courts have ordered post-judgment sanctions where the motion for sanctions was considered

7   collateral to the judgement.  For example, In *Dep't of Forestry & Fire Prot. v. Howell*, 18 Cal. App.

8   5th 154 (2017), the Court awarded monetary and terminating sanctions for discovery abuse post-

9   judgment and after the perfecting of an appeal.  There, the Court disagreed with the plaintiffs' /

10  appellants' argument that "the trial court lacked jurisdiction to impose a terminating sanction

11  postjudgment." *Id*. at 196.  The Court reasoned that the order for terminating sanctions was "not a

12  judgment" as it did "not purport to dismiss the action nor otherwise equate with rendition of

13  judgment" and was "not even a separately appealable order." *Id*.  The Court further stated:

14        Moreover, this postjudgment proceeding is collateral to the appeal because it is
          based on Cal Fire's alleged prejudgment discovery abuses, for which sanctions
15        proceedings could have occurred regardless of the outcome of the appeal of the
          judgment.  [Citation.]  Indeed, though motions concerning discovery are
16        generally to be heard no less than 15 days before the date initially set for trial
          (Code Civ. Proc., § 2024.020, subd. (a)), the Civil Discovery Act does not on
17        its face limit the ability of the trial court to impose sanctions for violation of its
          provisions to prejudgment motions for sanctions.  If we were to construe the
18        Civil Discovery Act as being so limited, it would permit the absurd situation in
          which those who have misused the discovery process can avoid penalty if they
19        are able to keep their misuse secret until after that deadline passes.  Neither can
          we construe the Civil Discovery Act as allowing only monetary sanctions
20        postjudgment, as Cal Fire argues.  ***If the trial court were prevented from
          exercising its discretion in this collateral postjudgment proceeding to impose
21        whatever sanction it deems appropriate, the effect could prejudice the party
          seeking sanctions and cause an undue waste of judicial resources***.
22

23  *Id*. at 197 (emphasis added.).

24        Similarly, in *Day v. Collingwood*,  the Court noted:

25        The rationale of the courts in *Frank Annino*, *West Coast Development*, and
          *Cooter & Gell* for considering sanctions motions filed after dismissal was, at
26        least in part, that a sanctions motion is a collateral proceeding that is not
          directly based on the merits of the underlying proceeding.  This would be true
27        whether the final resolution of the underlying matter is by voluntary dismissal
          or a judgment.  Further, a trial court's consideration of a postjudgment
28        sanctions request does not undermine the finality of the merits of the judgment.

                                          6
DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY
JONES AND HER ATTORNEYS; REQUEST FOR JUDICIAL NOTICE

1986265

Glaser Weil

1 | 144 Cal. App. 4th 1116, 1125 (2006).

2 |     Here, the Court can order post-judgment sanctions because the motion for sanctions is

3 | collateral to the judgement.  The motion is based on Ms. Jones' perjury and her counsel's

4 | misconduct, for which sanctions proceedings should take place regardless of the outcome of the

5 | appeal of the judgment.  In the course of Ms. Jones' litigation and trial, Ms. Jones and her attorneys

6 | engaged in conduct which undermines the integrity of the judicial system.  This motion is therefore

7 | about the appropriate sanctions applicable to the conduct of Ms. Jones and her attorneys, which

8 | deprived the Court of the ability to conduct a trial free from misconduct and deceit.

### 3.    Ms. Jones' Attorneys Misled the Court with Respect to the Operative Complaint

11 |     One of the most egregious misrepresentations was made to the Court not by Ms. Jones, but

12 | by her attorneys who, on the first day of trial, misled the Court as to which was the operative

13 | complaint.  As a result of counsel's misrepresentation, the Jones trial proceeded on a complaint that

14 | had been stricken and which included a cause of action for gender violence against Mr. David that

15 | was not included in the operative complaint.  The jury was instructed on the gender violence cause

16 | of action and returned a special verdict on that cause of action, awarding damages against Mr.

17 | David, including punitive damages.[4]

18 |     The FAC, filed on September 14, 2017, contained a cause of action against Mr. David for

19 | gender violence, which had not been pled in the initial complaint.[5]  According to a September 28,

20 | 2017 minute order, the Court ordered *sua sponte* that the FAC be stricken: "The court orders the

---

[4] Ms. Jones and Elizabeth Taylor were co-plaintiffs in the underlying case (BC649025) and their cases were bifurcated only for the purposes of trial.  Yet at the time of trial, The Bloom Firm proceeded in the Jones trial on the stricken FAC whereas, in the Taylor trial, it proceeded on the operative initial complaint, which did not include a gender violence cause of action.  *See* Declaration of Fred D. Heather ("Heather Decl."), Exh. A.

[5] The initial complaint had causes of action for: (1) employment discrimination – sexual harassment, (2) discrimination based upon disability, (3) failure to accommodate disability, (4) wrongful termination, (5) wrongful termination in violation of public policy, (6) retaliation, (7) retaliation in violation of Cal. Gov. Code § 12653, (8) sexual battery, (9) common law battery, (10) sexual assault, and (11) intentional infliction of emotional distress.  The FAC added a twelfth cause of action for gender violence based on Cal. Civ. Code § 52.4.

**DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY JONES AND HER ATTORNEYS; REQUEST FOR JUDICIAL NOTICE**

1    improperly filed First Amended Complaint stricken." Heather Decl., Exh. B.[6]  On the first day of

2    trial, the Court asked Ms. Jones' counsel about the operative pleading noting his understanding that

3    the FAC had been stricken.  Ms. Jones' counsel—Alan Goldstein who had been present at the

4    hearing pursuant to which the minute order was issued and Lisa Bloom—falsely assured the Court

5    that there was a second, validly filed FAC, which was the operative pleading.

6    THE COURT:        LET ME ASK THE PLAINTIFFS, THOUGH.  THERE IS A COMPLAINT.
                       THE ORIGINAL COMPLAINT ON FEBRUARY 2ND, 2017, IS THE
7                      OPERATIVE PLEADING?

8    MS. BLOOM:        THERE'S A FIRST AMENDED COMPLAINT, YOUR HONOR.

9    THE COURT:        NOT THE FIRST AMENDED COMPLAINT, IS IT?  THOUGHT THAT
                       WAS STRICKEN BECAUSE IT WAS NOT - -
10
     MR. GOLDSTEIN:    MAY I APPROACH, YOUR HONOR?
11
     THE COURT:        SURE.
12
     MR. GOLDSTEIN:    THANK YOU, YOUR HONOR.  ALAN GOLDSTEIN FOR THE
13                     PLAINTIFFS.  **THERE IS A FIRST AMENDED COMPLAINT**.

14   THE COURT:        I THOUGHT THAT WAS STRICKEN BECAUSE IT WAS FILED
                       WITHOUT PERMISSION OR SOMETHING LIKE THAT.
15
     MR. GOLDSTEIN:    **NO.  PERHAPS THERE WAS A PREVIOUS FIRST-AMENDED
16                     COMPLAINT.  THERE'S A FIRST AMENDED COMPLAINT
                       THAT'S THE OPERATIVE COMPLAINT.  THEN THERE WAS TWO**
17                     **- -**

18   THE COURT:        DO WE AGREE THAT'S THE OPERATIVE COMPLAINT, THE FIRST-
                       AMENDED?
19
     MS. GAROFALO:     THAT WAS OUR UNDERSTANDING, YOUR HONOR.[7]
20
     (Heather Decl., Exh. C at 3:13-4:7 (emphasis added).)
21
              When Defendants brought this issue to the Court's attention previously in post-trial briefing,
22

23   _____

24   [6] Defendants filed a motion for judgment on the pleadings, which on the court's docket is followed by an
     entry described only as a "minute order," dated September 28, 2017, attached to the Declaration of Fred D.
     Heather (filed concurrently) as Exhibit B.  Defendants' motion for judgment on the pleadings did not seek to
25   strike the FAC because the motion was brought prior to Ms. Jones filing the FAC but before the hearing on
     the motion.  The Court struck the FAC *sua sponte* in the same minute order relating to the motion for
26   judgment on the pleadings.

27   [7] At the time, Defendants' trial counsel was not aware of the minute order striking the FAC.  She and her firm
     had substituted in after the unexpected death of Defendants' prior counsel, who did not maintain electronic
     files and his paper files were in a state of disarray.  The files did not include a copy of the Court's minute
28   order striking the FAC.  *See* Heather Decl., Exh. D.

                                            8

1986265

1   Ms. Jones' counsel again misled the Court to believe that the matter was disputed, which is untrue.[8]

2   In its order, the Court stated, "It is too late to complain about an earlier court order that may have

3   stricken it [the FAC], and that appears to be disputed."  (Order on Defendants' Motion for a New

4   Trial.)  However, the record shows that (i) Ms. Jones did not file a motion for leave to file an

5   amended complaint after the FAC was stricken; and (ii) no other amended complaint was filed.  Had

6   the matter been in dispute, Mr. Goldstein's declaration in opposition to Defendants' Motion for a

7   New Trial would have denied that the FAC was stricken, attached the other purported amended

8   complaint that he represented to the Court existed, or shown that the gender violence cause of action

9   had not been dismissed.  Mr. Goldstein's declaration however did not do any of that.  In fact, when

10  Mr. Goldstein filed Ms. Jones' opposition to Defendants' *ex parte* application for leave to file a

11  supplemental brief in support of their motion for new trial—when Defendants first raised the

12  issue—Mr. Goldstein ethically was obligated to correct his misrepresentation to the Court, but he

13  did not.  *See* Heather Decl., Exh. E.  Mr. Goldstein's silence, in the face of his ethical obligation to

14  the Court, was not only improper, but also deprived the Court of the opportunity to address what had

15  occurred.[9]  Rather than speaking up, Mr. Goldstein chose to perpetuate the dishonesty toward the

16  tribunal by failing to correct the record.  *See* Ca. Prof. Conduct, Rule 3.3(a)(1) ("A lawyer shall not

17  knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of

18

19  _____

20  [8] Defendants raised this issue before the Court in July 2019 in connection with an *ex parte* application for
    leave to file a supplemental brief in support of their motion for new trial, in response to which Ms. Jones

21  argued, in part, that Defendants had waived the issue by not raising it in their motion for a new trial.  The
    Court agreed with Ms. Jones in ruling that the issue of the operative complaint had been waived and that the

22  matter was in dispute.  Because the "dispute" was a byproduct of the misrepresentation to the Court, the
    Court should review the equities in light of the showing the there was no dispute as to the issue of whether

23  there was another amended complaint; that, in fact, the operative complaint was not the one on which the trial
    was based.  Ms. Jones' attorneys cannot claim that this was "at worst a product of both parties' mistake."

24  Heather Decl., Exh. E.  It was an intentional misrepresentation to the Court, especially since Ms. Taylor's
    counsel—also The Bloom Firm—proceeded on the operative initial complaint for the Taylor trial that

25  proceeded ***after*** the Jones trial, in August 2019, and Ms. Taylor did not submit an instruction on a gender
    violence claim.  *See* Heather Decl., Exh. A.

26  [9] The improper inclusion of the gender violence cause of action is particularly significant because the jury
    found in favor of Mr. David on the related causes of action for battery and assault.  On the special verdict

27  form, the jury answered "no" to the questions "Did Alkiviades David touch Chasity Jones with the intent to
    harm or offend her?" and "Did Alkiviades David act, intending to cause a harmful or an offensive contact

28  with Chasity Jones or intending to place her in fear of a harmful or an offensive contact?" resulting in a
    finding of no liability for the battery and assault causes of action.

9

Glaser Weil

1986265

1    material fact or law previously made to the tribunal by the lawyer.").

2         Had Ms. Jones' attorneys answered the Court's question about the operative complaint

3    accurately, the instructions the jury would have received for use at deliberation would be very

4    different, and Mr. David would not have been found liable for gender violence—the cause of action

5    that was not in the operative complaint—given the fact that the jury did not find him liable for

6    sexual battery or assault.  As such, Mr. David was deprived of the ability to avoid liability for

7    gender violence, solely due to the fraud and Ms. Jones' attorneys' conduct.  It cannot be challenged

8    that had Ms. Jones' counsel been honest, Mr. David would not have been deprived of that ability.

9        **4.**    **Ms. Jones Submitted an Untruthful Sworn Declaration to the Court**

10        Ms. Jones lied to the Court about her criminal record.  Her attorneys, at best, failed to ensure

11   that what was presented to the Court was truthful.

12        In April 2019, shortly before her trial, Ms. Jones submitted a sworn declaration in

13   connection with her motion *in limine* for an order excluding evidence of her prior criminal

14   conviction for bank fraud prosecuted by the United States' government.  In the declaration, Ms.

15   Jones stated, "I was sentenced in 2004 to probation and ordered to pay a fine of $6,724.76 as

16   restitution.  I complied with all terms of my conviction."  Heather Decl., Exh. F.  Both statements

17   are false.

18        Court records show that on November 29, 2002, Ms. Jones was indicted on four counts of

19   bank fraud.[10]  According to a March 19, 2004 order, Ms. Jones was "committed to the Bureau of

20   Prisons on Count One of the Four-Count Indictment to a term of one (1) month to be followed by

21   three (3) years of supervised release," and ordered to "pay restitution in the total amount of

22   $182,969.00" to Wells Fargo Bank, not $6,724.76.  Heather Decl., Exh. G.  Therefore, Ms. Jones

23   not only lied to the Court about the amount of the restitution that she was ordered to pay, but also

24   omitted the fact that she was sentenced to one month in prison as a result of her conviction.

25        Ms. Jones also lied about having "complied with all terms of [her] conviction."  Heather

26   Decl., Exh. F.  According to a Petition on Probation and Supervised Release, dated July 31, 2006,

27

28   _____

[10] The federal indictment was based on deposits of counterfeit checks and cashing of counterfeit checks.

10

**DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY
JONES AND HER ATTORNEYS; REQUEST FOR JUDICIAL NOTICE**

1986265

1   the Court determined that Ms. Jones had violated the terms and conditions of her probation by

2   opening lines of credit with three different banks, despite having been ordered not to do so without

3   prior approval.[11]

4        Because Ms. Jones violated the terms of her probation, the government moved to revoke her

5   probation and the Court extended her probation for six months.  While the Court excluded Ms.

6   Jones' conviction because of its age, the perjury Ms. Jones committed was fresh and current and

7   should have informed the Court and the jury of Ms. Jones' lack of credibility as a witness.  Not only

8   was Mr. David unable to bring Ms. Jones' lie to the jury's attention, but the manner in which Ms.

9   Jones minimized her past offense may have contributed to the Court's decision that her prior

10  conviction could not be introduced to the jury at all.

11       In sum, Ms. Jones' attorneys either intentionally or by gross negligence presented a false

12  declaration to the Court on behalf of their client.  That declaration, as discussed above, deprived the

13  Court of material information relevant to the Court's decision to rule on Jones' motion *in limine* to

14  exclude evidence regarding her criminal conviction.  Had the Court known about the perjury, it may

15  have affected that decision as well.[12]  However, the issue here is not what the Court would have

16  done.  The issue is that the Court and Mr. David were deprived of the material facts necessary to

17  argue fairly the admissibility and probative value of the evidence.  Had Mr. David been able to put

18  forth evidence of Ms. Jones' perjury in front of the jury, he would have been able to argue that it

19  was proper to instruct the jury, that, if they believe from the evidence that Ms. Jones has knowingly

20  testified falsely to any material fact, they may disregard the whole of her testimony.[13]  Under the

21  common law maxim "falsus in uno, falsus in omnibus," that is, "false or untruthful as to one thing,

22  _____

23  [11] *See* Heather Decl., Exh. H: "Having been ordered by the Court not to apply for any loan or open any line of credit without prior approval of the Probation Officer, Chasity Jones opened a line of credit" with (i) "First Premier Bank on or about July 2004"; (ii) "Capital One Bank on or about September 2004"; and (iii)
24  "Cashcall Inc on or about August 2005."

25  [12] The Court's decision as to whether to admit Ms. Jones' prior felony conviction was discretionary.  Had the Court been made aware of the true facts, the Court would not have been deprived of the ability to take into
26  account Ms. Jones' perjury in determining whether to admit the prior felony conviction.  As such, it cannot be contested that the conduct of Ms. Jones and her attorneys impaired Mr. David's entitlement to a fair trial.

27  [13] Mr. David would like to point out that Ms. Jones testified as a witness at Ms. Taylor's trial, where the jury came out in favor of Mr. David in an 8-to-4 vote.  Had Ms. Jones' perjury or her propensity for
28  untruthfulness been exposed, Mr. David may have prevailed.

11

1986265

1   false or untruthful as to all things," the jury may properly be instructed that a witness willfully false

2   as to a material matter in one part of his or her testimony is to be distrusted in others.  *Poor v. W.P.*

3   *Fuller & Co*., 30 Cal. App. 650 (1916).  According to this doctrine, if testimony of a witness on a

4   material issue is willfully false and given with an intention to deceive, the jury may disregard all

5   that witness's testimony.  *In re Vargas*, 83 Cal. App. 4th 1125 (2000).

6           **5.**      <u>**Ms. Jones Was Untruthful and Dishonest in Her Trial Testimony**</u>[14]

7           Mary Rizzo worked for Filmon as an advertising account representative from approximately

8   January 2015 to March 2016.  (David Decl., ¶ 2.)  In or around June 2016, she filed a lawsuit against

9   Mr. David and other entities and her claims were settled in or around October 2016.  (*See id*. at ¶ 3.)

10   Ms. Rizzo and Mr. David had a text-message conversation in or around November 2019 where Ms.

11   Rizzo expressed her belief that "some of the lawsuits that were filed against [Mr. David] and the

12   entity defendants after her settlement were filed at least because of the plaintiffs' knowledge of the

13   terms of her settlement and not because they had valid claims," including Ms. Jones' lawsuit.  (*Id*. at

14   ¶ 4.)  The following are some examples of Ms. Jones' trial and deposition testimony that are

15   contradicted by Ms. Rizzo's text messages to Mr. David and a former Filmon employee's sworn

16   declaration:

17       •   At trial, Ms. Jones claimed that when she posted a picture of herself in her bathing suit on

18            Instagram on Easter Sunday 2015, Mr. David came up to her the next day and said that he

19            liked the picture she posted and that, "You need to post more pictures like that."  (Reporter's

20            Transcript, 362:2-19.)  Ms. Jones testified that as a result of Mr. David's comment she "was

21            in shock," "felt violated by [her] superior," and "wanted to get away from [Mr. David]."

22            (RT, 362:20-23)  Ms. Jones testified that she "went immediately and told Mary Rizzo."  (RT,

23            362:24-26.)  Ms. Rizzo stated that she "was right next to [Ms. Jones] when [Mr. David]

24            commented on [the picture].  She [Ms. Jones] posted it for [Mr. David], she [Ms. Jones] told

25

26   _____

[14] The information presented in sections 5 and 6 regarding Ms. Jones' dishonesty in her trial testimony and
27   Ms. Jones' attorney bullying a witness punctuate the fact that there has been a miscarriage of justice with
respect to Mr. David.  Mr. David does not request that the Court award sanctions for this specific conduct.
Instead, these are instances that, combined with the clearly egregious perjury of Ms. Jones and the
28   misconduct of her counsel, demonstrate that the Court cannot have faith that the trial of this matter was fair.

*Glaser Weil*

[Ms. Rizzo] and [Ms. Jones] was so happy [Mr. David] noticed the picture." (David Decl., ¶ 8.)  At the time, Ms. Jones "would tell [Ms. Rizzo] she wanted to be with [Mr. David] all the time and even had a dream about [Mr. David]." (*Id*.)  In fact, Ms. Rizzo told Ciara Menifee (former Filmon Media Coordinator), that "Ms. Jones told her that Mr. David was 'hot' and that she, Ms. Jones, 'would give him a chance.'" (Menifee Decl., ¶ 5.)  Ms. Menifee "also personally observed Ms. Jones flirt with Mr. David while at work.  She [Ms. Jones] was open about her romantic feelings for Mr. David." (*Id*. at ¶ 6.)

- In her deposition, Ms. Jones was asked, "Did you ever spank Alki David on the behind playfully at work?"  She responded, "No." (Jones Dep., 119:4-6.)  In a November 20, 2019 text message to Mr. David, Ms. Rizzo stated that, "People also witnessed her [Chasity Jones] spank [Mr. David] by the editing department." (David Decl., ¶ 5.)  Ms. Menifee also "recall[s] one incident where [Ms. Menifee], Mr. David, two employees from the production department, and Carl Dawson (Ms. Jones' supervisor) were in a standing meeting in the editing department.  Ms. Jones came out of the kitchen and smacked Mr. David on the butt in front of everyone.  [Ms. Menifee] was shocked and could not believe that Ms. Jones would do that to her boss.  Ms. Jones' behavior made [Ms. Menifee] feel uncomfortable." (Menifee Decl., ¶ 7.)

### 6. Ms. Jones' Attorneys "Bullied" At Least One Potential Witness to Testify on Ms. Jones' Behalf

Mr. David has obtained a declaration from a percipient witness who did not testify at the Jones trial, but who states under oath that she believed Ms. Jones' lawyers tried to "bully" her to provide testimony that was "not true." (*See* Menifee Decl., ¶ 16.)

In or around May 2019, Ms. Jones' lawyers contacted Ms. Menifee though her then lawyer, David Osorio.  (Menifee Decl., ¶ 10.)  "With the help of Mr. Osorio, [Ms. Menifee] prepared a written statement about [her] knowledge of Ms. Jones and her claims against Mr. David and the Company," which included the following information: (i) "[o]n several occasions, Ms. Jones—who had learned about Ms. Rizzo's lawsuit against and settlement with Filmon and Mr. David—asked [Ms. Menifee] how much money Ms. Rizzo had received as a result of her settlement.  [Ms.

13

1   Menifee] told her [she] did not know, yet Ms. Jones continued to ask [her] about the amount of Ms.

2   Rizzo's settlement"; (ii) "Ms. Rizzo told [Ms. Menifee] that Ms. Jones made sexually suggestive

3   remarks and comments about Mr. David.  For example, Ms. Rizzo said that Ms. Jones said to her

4   that Mr. David was 'hot' and that she, Ms. Jones, 'would give him a chance'; (iii) Ms. Menifee

5   "personally observed Ms. Jones flirt with Mr. David while at work.  She was open about her

6   romantic feelings for Mr. David"; and (iv) Ms. Menifee "recall[ed] one incident where [Ms.

7   Menifee], Mr. David, two employees from the production department, and Carl Dawson (Ms. Jones'

8   supervisor) were in a standing meeting in the editing department.  Ms. Jones came out of the kitchen

9   and smacked Mr. David on the butt in front of everyone."  (Menifee Decl., ¶¶ 4-7, 11.)

10          After Ms. Menifee's written statement was received by Ms. Jones' attorneys, a telephone

11   call was set up "for the purposes of The Bloom Firm preparing [Ms. Menifee] to testify in support of

12   Ms. Jones at trial" in or around July 2019.  (Menifee Decl., ¶ 12.)  However, Ms. Bloom appeared to

13   disregard Ms. Menifee's written statement in its entirety.  (*See id.* at ¶ 13.)  "Despite what [Ms.

14   Menifee] had stated in [her] written statement, Ms. Bloom pressured [her] to testify that [she] was a

15   victim and that Mr. David had 'preyed' on [her]."  (*Id.*)  Ms. Bloom told Ms. Menifee that she "was

16   part of the 'Me Too' movement and that [she] needed to stand up for [herself] and other women."

17   (*Id.*)  Ms. Menifee told Ms. Bloom that she "did not agree that [she] was a victim or that Mr. David

18   had preyed upon [her].  Nevertheless, Ms. Bloom continued to pressure [her] to testify in the way

19   that she wanted [Ms. Menifee] to testify."  (*Id.*)  Ms. Bloom also "repeatedly told [Ms. Menifee] that

20   Mr. David was a 'bad man,' that he deserved what he was getting, and that [Ms. Menifee] needed to

21   say that [she] was 'victimized' by Mr. David."  (*Id*. at ¶ 16.)  Ms. Menifee "felt that [Ms. Bloom]

22   was bullying [her] into testifying to matters that were not true."  (*Id.*)

23          Ms. Bloom's pressure was such that "[a]t some point during the call, [Ms. Menifee] asked

24   for a break to speak privately with [her] attorney, Mr. Osorio, because [she] felt uncomfortable with

25   what [she] felt was pressure from Ms. Lisa Bloom.  During the break, [Ms. Menifee] communicated

26   to Mr. Osorio [her] discomfort and desire not to testify.  When Mr. Osorio and [Ms. Menifee] got

27   back on the call, Ms. Lisa Bloom continued her questioning in the same manner as before."

28   (Menifee Decl., ¶ 20.)

**DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY
JONES AND HER ATTORNEYS; REQUEST FOR JUDICIAL NOTICE**

1986265

1    The Bloom Firm's interactions with Ms. Menifee are troubling.  Coupled with Ms. Jones'

2 perjury, they cast further doubt on the veracity and reliability of any of Ms. Jones' evidence

3 presented at trial and in turn on the fundamental integrity of the trial itself.

## III.    EVIDENTIARY HEARING

5    For the reasons explained above, the full extent and seriousness of the perjury and

6 misconduct in this case can be evaluated only by conducting an evidentiary hearing, where Ms.

7 Jones and her counsel may testify under oath and be subjected to cross examination.  That testimony

8 may reveal, for example, whether the perjurious Jones' declaration was the result of gross

9 negligence, willful blindness, or subornation by Jones' counsel.[15]  In the alternative, Mr. David

10 requests an order directing Ms. Jones and her attorneys to be deposed with regard to issues raised in

11 this motion, prior to the Court's ruling on the merits.

## IV.    REQUEST FOR RELIEF

13    Only by the imposition of severe sanctions on the actors involved can this Court provide

14 some measure of justice to Mr. David and hopefully ensure that the parties involved in the egregious

15 misconduct in this case are deterred from similar conduct in the future.  Ms. Jones' attorneys'

16 conduct is reprehensible, inexcusable, and sanctionable and Ms. Jones' counsel cannot be permitted

17 to flaunt the judicial process.  Accordingly, Mr. David requests the following relief: (i) the entirety

18 of Mr. David's attorney's fees and costs incurred in this action; (ii) referral to the State Bar for Ms.

19 Jones' attorneys so that their conduct may be reviewed for possible disciplinary action; (iii) an

20 evidentiary hearing; and (iv) Such other relief that the Court deems just and proper.

21  DATED:  April 28, 2021                 GLASER WEIL FINK HOWARD
                                                              AVCHEN & SHAPIRO LLP

23                                                    /s/Fred Heather
                                               By:  _____
24                                                    Fred D. Heather
                                                      Elias Dabaie
25                                                    *Attorneys for Defendants*
                                                      *Alkiviades David and Hologram USA Inc.*

---

[15] Suborning perjury is a crime (Cal. Pen. Code § 127).  Mr. David reserves the right to request that the Court order the production of all communications between the Bloom Firm and Ms. Jones regarding Ms. Jones' declaration, under the crime-fraud exception, either as an alternative to an evidentiary hearing, or in combination with it.

1986265

**Glaser Weil**

## **DECLARATION OF ALKIVIADES DAVID**

I, Alkiviades David, state and declare as follows:

1.     I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would competently testify to the facts set forth herein of my own personal knowledge.

2.     Mary Rizzo worked for Filmon Media Holdings, Inc. ("Filmon") as an advertising account representative from approximately January 2015 to March 2016.

3.     In or around June 2016, she filed a lawsuit in the Superior Court of California, Central District of Los Angeles County (Case No. BC622384) against Alkiviades David, Filmon, and other related entities, including Anakando Media Holdings, Inc. and Anakando Media Group USA, in connection with claims arising out of her employment with Filmon.  In or around October 2016, she settled her claims against the defendants.

4.     Shortly after the settlement, other Filmon employees learned about its financial terms.  Ms. Rizzo told me, in a text message, that she believed that some of the lawsuits that were filed against me and the entity defendants after her settlement were filed at least partly because of the plaintiffs' knowledge of the terms of her settlement and not because they had valid claims.  On November 20, 2019, Ms. Rizzo sent a text message to me expressing that belief.  Ms. Rizzo stated, in part,  "I think it's messed up that the girls found out about the settlement and decided to sue too." Attached as Exhibit A is a true and correct copy of Ms. Rizzo's text messages to me.

5.     Also on November 20, 2019, Ms. Rizzo stated, in part, "People also witnessed her [Chasity Jones] spank you [David] by the editing department."  *See* Ms. Rizzo's text message to me, Exhibit A.

6.     Ms. Rizzo had her deposition taken on September 18, 2017 and January 28, 2019 in connection with the Elizabeth Taylor and Chasity Jones case (Case No. BC649025).  Thereafter, Ms. Jones "threatened [Ms. Rizzo] and harassed [her] after [her] deposition because she [Ms. Jones] was mad [Ms. Rizzo] didn't lie for her." *See* Ms. Rizzo's text message to me, Exhibit A.

7.     Ms. Menifee is a former Filmon employee and Ms. Jones' former coworker, and on the basis of information and belief, Ms. Rizzo's cousin.  Ms. Rizzo informed me in a text message

that "Chasity [Jones] constantly would ask [Ms. Rizzo's] cousin [Ciara Menifee] how much money [Ms. Rizzo] got and wouldn't leave her [Ms. Menifee] alone about it." *See* Ms. Rizzo's text message to me, Exhibit A.

8.      On one occasion, Ms. Jones posted to her Instagram account a picture of herself wearing a bikini, which she told Ms. Rizzo that she posted in order to get my attention.  Ms. Jones testified at trial that I "came up to [her] and said, 'I like that picture you posted.  You need to post more pictures like that.'" (Trial Transcript, 362:13-19.)  She testified that she "was in shock" and "felt violated by [her] superior," that "it made [her] feel uncomfortable, like [she] wanted to get away from [me]." (*Id.*, 362:20-26.)  Ms. Rizzo told me, in a text message, that she had read Ms. Jones' testimony about the Instagram photo: "I read the part about what she [Ms. Jones] said about the Instagram photo she posted in her bikini and said how you [David] commented on it and how she was disgusted.  I was right next to her [Ms. Jones] when you [David] commented.  She [Ms. Jones] posted it for you, she told me and she was so happy you [David] noticed the picture." Further, Ms. Jones "would tell [Ms. Rizzo] she wanted to be with you [David] all the time and even had a dream about you [David]." *See* Ms. Rizzo's text message to me, Exhibit A.

9.      On December 4, 2019, Ms. Rizzo sent a text message to me, stating "I think it's disgusting how these women are abusing the #metoo movement all because of my lawsuit.  It all started with Chasity [Jones] finding out how much my settlement amount was, and then them teaming up and I've been harassed ever since."  Attached as Exhibit B is a true and correct copy of Ms. Rizzo's text messages to me.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration is executed on December 28, 2020 at Saanen, Switzerland.



DocuSigned by:
5E3AB53F077A450...

Alkiviades David

# Exhibit A

**2:24**



**Maryevelyn** ›

iMessage
Nov 20, 2019, 3:21 PM

Hi Mary. Am at the courthouse in MK legal fight downtown. I'm told she was sleeping with grant at the same time as you were.

Would you mind if I called you as a rebuttal witness about our settlement agreement. Not about MK and grant

Nov 20, 2019, 4:40 PM



**2:24**



< 340



**Maryevelyn** >

Nov 20, 2019, 4:40 PM

I can't, it's a confidential settlement agreement. I think it's messed up that the girls found out about the settlement and decided to sue too. You also weren't present during the stripper. I remember. Also chasity said she was fired because she wouldn't sleep with you, but you were out of town for months when she got fired and other people were fired



2:25

< 340

Maryevelyn >

other people were fired at the same time as her. I have the texts from her telling me this.

People also witnessed her spank you by the editing department. She also threatened me and harassed me after my deposition because she was mad I didn't lie for her

Thank you Mary.

You can. It's been discussed in every trial.

The agreement.

Subject

iMessage



2:25

← 340

**Maryevelyn** ›

The lawyer Ring gave it to elizabeth Taylor.

Maybe we can meet and catch up.

The lawsuit or the settlement?

Do you know anything about Mahim Kahn.

The settlement.

That had been discussed a lot

If you know anything I can get her impeached and get you on the stand.



Subject

iMessage

2:25



< 340

**Maryevelyn** ›

I never ever one ever touched MK but she had Lush and lushes wife to lie

It's not public information, I don't understand that. The only thing I know about MK is that when Elizabeth first contacted Gloria Allred, she told Elizabeth she needed chasity and MK or she wouldn't take the case

Lush said he didn't have a beef with me and went on to lie

Subject

iMessage



**2:25**

340

**Maryevelyn** ›

and went on to lie

They brought it

Elizabeth Taylor has a copy

Ring gave it to her it's in her transcripts

In her own deposition

They all lied mary all of them.

Wow

What you just said interesting.

Chasity constantly would ask my cousin



Subject

iMessage

2:25





340

Maryevelyn ›

how much money I got
and wouldn't leave her
alone about it. She
went to Larry Ring and
he only told her he
could get her 50k, then
when she found out
what my settlement
was, she joined
Elizabeth. I have texts
or Chasity saying
Elizabeth was hooker
and that she was going
to get a restraining
order from her, up until
they had to join the
lawsuit together

Seen the last ones.

Subject

iMessage

2:25



< 340



Maryevelyn >

I'm just so tired of being harassed by Lisa when I know for a fact these girls are lying

Those helped me a lot.

I would like to see you and talk to you.

If that's ok

Chasity would tell me she wanted to be with you all the time and even had a dream about you...and I read the part about what she said about the Instagram photo she





< 340    Maryevelyn ›

posted in her bikini and said how you commented on it and how she was disgusted. I was right next to her when you commented. She posted it for you, she told me and she was so happy you noticed the picture

Lush testified about grant being with MK?

Carl told me

There's a lot that was happening that I had no idea

Subject

iMessage

      

# Exhibit B



2:30

‹ 340    Maryevelyn ›

texts out there now...

It's good

Wed, Dec 4, 2:11 PM

Can u connect me with Dana Cole ?

Wed, Dec 4, 3:14 PM

I think it's disgusting how these women are abusing the #metoo movement all because of my lawsuit. It all started with Chasity finding out how much my settlement amount was, and then them



 

**Maryevelyn** ›

was, and then them teaming up and I've been harassed ever since. I have told Dana what I know is not true and I also said these things in my depo. I don't know if Dana will help with Lisa, but he also thinks it's not fair what they're doing to me. I think it's best if you have your attorney reach out to him

Speak to Dana.

I spoke with him.



## DECLARATION OF CIARA MENIFEE

I, Ciara Menifee, state and declare as follows:

1.       I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would competently testify to the facts set forth herein of my own personal knowledge.

2.       I worked for Filmon TV Networks ("Filmon" or "the Company") as a Media Coordinator from in or around October 2015 to March 2017.

3.       My relative, Mary Rizzo, also worked for Filmon.  Sometime in or around early 2016, Ms. Rizzo filed a lawsuit against Alkiviades David and the Company.  Shortly thereafter, she reached an agreement with the defendants in that lawsuit to drop her claims in exchange for a monetary settlement.

4.       During my work for Filmon, I became acquainted with another employee, Chasity Jones.  On several occasions, Ms. Jones—who had learned about Ms. Rizzo's lawsuit against and settlement with Filmon and Mr. David—asked me how much money Ms. Rizzo had received as a result of her settlement.  I told her I did not know, yet Ms. Jones continued to ask me about the amount of Ms. Rizzo's settlement.  I found Ms. Jones' incessant questioning was inappropriate and annoying and I made at least two written complaints to the Company about it.

5.       Ms. Jones and Ms. Rizzo shared an office when they worked at Filmon.  Ms. Rizzo told me that Ms. Jones made sexually suggestive remarks and comments about Mr. David.  For example, Ms. Rizzo said that Ms. Jones told her that Mr. David was "hot" and that she, Ms. Jones, "would give him a chance."

6.       I also personally observed Ms. Jones flirt with Mr. David while at work.  She was open about her romantic feelings for Mr. David.

7.       I recall one incident where I, Mr. David, two employees from the production department, and Carl Dawson (Ms. Jones' supervisor) were in a standing meeting in the editing department.  Ms. Jones came out of the kitchen and smacked Mr. David on the butt in front of everyone.  I was shocked and could not believe that Ms. Jones would do that to her boss.  Ms. Jones' behavior made me feel uncomfortable.

1753993

DocuSign Envelope ID: 45D1C6C-54DF-4691-B7A-5D744CEDBBEA

8.      Ms. Jones never told me that Mr. David had acted inappropriately toward her in any way.  Ms. Jones was quite vocal about complaints she had at the workplace and I believe she would have told people had she been subjected to any inappropriate or harassing conduct by Mr. David or anyone else.

9.      I recall that sometime in or around October or December 2016, Ms. Jones was angry at Mr. David because of dispute over a commission that she said was owed to her.  She told me that Mr. David "deserved to be sued," and that she would "get him."

10.     I learned that Ms. Jones later filed a lawsuit against Filmon and Mr. David.  Shortly before the trial of Ms. Jones' lawsuit, sometime in or around May 2019, someone from The Bloom Firm, who represented Ms. Jones, contacted me through my lawyer, David Osorio, who at the time was with the law firm of Blair & Ramirez LLP.

11.     With the help of Mr. Osorio, I prepared a written statement about my knowledge of Ms. Jones and her claims against Mr. David and the Company.  My written statement included the information in paragraphs 4 to 10 above.  Mr. Osorio emailed my written statement to The Bloom Firm.  After The Bloom Firm received the statement, Lisa Bloom's daughter, Sarah Bloom, who is also an attorney with the Bloom Firm, contacted Mr. Osorio and requested to interview me.

12.     In or around July 2019, Lisa Bloom, Sarah Bloom, Mr. Osorio, and I had a telephone call, which I understood was for the purpose of The Bloom Firm preparing me to testify in support of Ms. Jones at trial.  During the call, Ms. Lisa Bloom acknowledged that she had received my written statement and so I assumed she knew its contents and would know what my testimony would be if I were to testify at trial.

13.     Despite what I had stated in my written statement, Ms. Bloom pressured me to testify that I was a victim and that Mr. David had "preyed" on me.  She told me that I was part of the "Me Too" movement and that I needed to stand up for myself and other women.  I told her I did not agree that I was a victim or that Mr. David had preyed upon me.  I also did not believe that I was part of the "Me Too" movement as my claims against the Company and Mr. David were different.  Nevertheless, Ms. Bloom continued to pressure me to testify in the way that she wanted me to testify.  I expressed that I would not be comfortable testifying in this way because what she was

**DECLARATION OF CIARA MENIFEE**

DocuSign Envelope ID: 45D1C68C-E4BF-4681-B171-5D744CEDBBE8

1 asking me to say was not true.

2       14.    Ms. Bloom also asked me about my observations of Ms. Jones in the workplace.
3 From Ms. Bloom's questioning of me, I understood that she wanted me to testify that Ms. Jones was
4 a good employee, which I did not believe was true.  For instance, Ms. Bloom suggested that I testify
5 that Ms. Jones would come to work on time, but, based on my observations, that was not a true
6 statement.  I observed that Ms. Jones appeared to come and go as she pleased and, once at work, she
7 would spend a lot of time walking around and talking with people about matters not related to work.
8 In general, she had a bad attitude.

9       15.    I told Lisa and Sarah Bloom during our phone call that (i) I had seen Ms. Jones slap
10 Mr. David on the butt while other employees, Mr. David, and I were having a meeting in the editing
11 department; (ii) I had heard Ms. Jones refer to Mr. David as "sexy" and "hot"; (iii) I had read text
12 messages from Ms. Jones to Ms. Rizzo, where Ms. Jones stated that she wanted to "hook up" and
13 have sex with Mr. David; (iv) I had complained to the Company about Ms. Jones repeatedly asking
14 me about the amount of Ms. Rizzo's settlement; and (v) Ms. Jones told me that she was going to
15 "partner" with Elizabeth Taylor to sue Mr. David.

16       16.    Nevertheless, Ms. Lisa Bloom repeatedly told me that Mr. David was a "bad man,"
17 that he deserved what he was getting, and that I needed to say that I had been "victimized" by him
18 throughout my employment at Filmon.  I felt that she was bullying me into testifying to matters that
19 were not true.

20       17.    For example, when I told Ms. Bloom that I did not believe that I was victimized by
21 Mr. David, she questioned "Well, he did prey on you, didn't he?"  She asked me leading questions
22 and seemed to get frustrated with me because I did not agree with her statements.  I was surprised
23 because I had laid out my testimony very clearly in my written statement, which Ms. Bloom said she
24 had seen before our call.

25       18.    Ms. Bloom did not ask me any questions about the contents of my written statement;
26 nor did she ask about the alleged conduct of Mr. David at issue; i.e., whether I had seen Mr. David
27 behave inappropriately toward Ms. Jones.  If she had asked me that, I would have told Ms. Bloom
28 that I had not seen Mr. David behave inappropriately toward Ms. Jones, but I had seen Ms. Jones act

**DECLARATION OF CIARA MENIFEE**

DocuSign Envelope ID: 45D1C66C-E4BF-4681-B171-5D744CEDBBE8

1   inappropriately toward Mr. David by, for example, slapping him on the butt in the workplace.

2          19.     It appeared to me that neither Lisa nor Sarah Bloom was interested in the information

3   I was relaying to them about Ms. Jones' inappropriate workplace behavior and motives for filing a

4   lawsuit against Mr. David and the Company.  I believe they wanted me not to testify about these

5   matters because when I tried to tell them the truth about what happened, Ms. Lisa Bloom told me

6   not to focus on that and to focus only on what she was asking me.

7          20.     At some point during the call, I asked for a break to speak privately with my

8   attorney, Mr. Osorio, because I felt uncomfortable with what I felt was pressure from Ms. Lisa

9   Bloom.  During the break, I communicated to Mr. Osorio my discomfort and desire not to testify.

10  When Mr. Osorio and I got back on the call, Ms. Lisa Bloom continued her questioning in the same

11  manner as before.

12         21.     The Bloom Firm tried to serve me with a subpoena to testify at Ms. Jones' trial on at

13  least two occasions by sending someone to my home.  I did not open the door on either occasion.  I

14  also received a call from someone who described himself as an "investigator" and who explained

15  that he was looking for me to serve me with some paperwork from the Bloom Firm.  He also told

16  me that I was required by law to testify.  I refused to cooperate voluntarily with the Bloom Firm

17  because I was not willing to testify the way Ms. Bloom was coaching me to testify.

18         I declare under penalty of perjury under the laws of the State of California that the foregoing

19  is true and correct and that this declaration is executed on ___December 28___, 2020 at Los

20  Angeles, California.

21

22                                            _____

23                                            Ciara Menifee

24

25

26

27

28

**DECLARATION OF CIARA MENIFEE**

1753993

# Journal Technologies Court Portal

# Make a Reservation

**ELIZABETH TAYLOR ET AL VS ALKIVIADES DAVID ET AL**

Case Number: BC649025   Case Type: Civil Unlimited   Category: Wrongful Termination
Date Filed: 2017-02-02   Location: Stanley Mosk Courthouse - Department 31

## Reservation

| | |
|---|---|
| Case Name:<br>ELIZABETH TAYLOR ET AL VS ALKIVIADES DAVID ET AL | Case Number:<br>BC649025 |
| Type:<br>Motion for Sanctions | Status:<br>RESERVED |
| Filing Party:<br>Alkiviades David (Defendant) | Location:<br>Stanley Mosk Courthouse - Department 31 |
| Date/Time:<br>08/18/2021 8:30 AM | Number of Motions:<br>1 |
| Reservation ID:<br>100082895195 | Confirmation Code:<br>CR-UFPFPD62Q5KRFNAUV |

## Fees

| Description | Fee | Qty | Amount |
|---|---|---|---|
| Motion for Sanctions | 60.00 | 1 | 60.00 |
| Credit Card Percentage Fee (2.75%) | 1.65 | 1 | 1.65 |
| TOTAL | | | $61.65 |

## Payment

| | |
|---|---|
| Amount:<br>$61.65 | Type:<br>Visa |
| Account Number:<br>XXXX2188 | Authorization:<br>045020 |

🖨 Print Receipt      ➕ Reserve Another Hearing

Copyright © Journal Technologies, USA. All rights reserved.

Chat

**Glaser Weil**

1

<u>**PROOF OF SERVICE**</u>

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3

     I am employed in the County of Los Angeles, State of California; I am over the age of 18

4

and not a party to the within action; my business address is 10250 Constellation Boulevard, 19th
Floor, Los Angeles, California 90067.

5

     On **April 29, 2021**, I caused the foregoing document(s) described as **DEFENDANT**

6

**ALKIVIADES DAVID'S NOTICE OF MOTION AND MOTION FOR SANCTIONS**
**AGAINST PLAINTIFF CHASITY JONES AND HER ATTORNEYS; REQUEST FOR**

7

**EVIDENTIARY HEARING** to be served on the interested parties to his action by personal
service; i.e., personal delivery of true copied thereof to the following:

8

9

Lisa Bloom, Esq.                       *Attorneys for Plaintiff*

10

Alan Goldstein, Esq.               Chasity Jones
THE BLOOM FIRM

11

26565 Agoura Road, Suite 200
Calabasas, CA 91302

12

13

☒    (State)     I declare under penalty of perjury under the laws of the State of California that

14

                    the above is true and correct.

15

     Executed on **April 29, 2021**, at Los Angeles, California.

16

17

                               /s/Tania Seanpanah

18

                                  Tania Seanpanah

19

20

21

22

23

24

25

26

27

28

16

**DEFENDANT ALKIVIADES DAVID'S MOTION FOR SANCTIONS AGAINST PLAINTIFF CHASITY**
**JONES AND HER ATTORNEYS; REQUEST FOR JUDICIAL NOTICE**